MacDougall *v.* Penna. Power & Light Co.

388

Argued May 1, 1933. Before FRAZER, C. J., SIMPSON, SCHAFFER, MAXEY, DREW and LINN, JJ.

*Charles C. Clark,* with him *William J. Wilcox,* for appellant.—There is no direct evidence of the cause of the accident or to prove negligence in the condition and operation of the defendant's facilities at the time: Eberlin v. Electric Co., 306 Pa. 239; Kilbride v. Carbon Dioxide & Magnesia Co., 201 Pa. 552; Titus v. R. R., 136 Pa. 618; Stark v. Elec. L. & P. Co., 218 Pa. 575; Albus v. Toomey, 273 Pa. 303; Electric Reduction Co. v. Steel Co., 276 Pa. 181; Farne v. Lighting Co., 275 Pa. 444.

There is absolutely no competent testimony in this case that the equipment of the defendant or the construction of the equipment was not in accordance with the ordinary usuage in the business: Cavanaugh v. Light

Co., 226 Pa. 86; Flanigan v. McLean, 267 Pa. 553; Bowman v. Stouman, 292 Pa. 293; Wiser v. Baking Co., 289 Pa. 565.

Plaintiff was guilty of contributory negligence: Haertel v. Light & Power Co., 219 Pa. 640; Aljoe v. Light & Power Co., 281 Pa. 368; Weir v. Elec. Light Co., 221 Pa. 611.

Testimony of defendant's failure to place warning on its equipment was inadmissible to establish evidence: Delaware & Hudson Canal Co. v. Barnes, 31 Pa. 193; Haun v. McCabe, 308 Pa. 431; Rosenstiel v. Rys., 230 Pa. 273.

*H. F. Bonno,* with him *Fred B. Moser,* for appellee, cited: Fitzgerald v. Electric Illuminating Co., 200 Pa. 540; Yeager v. Illuminating Co., 242 Pa. 101; Daltry v. Light, Heat & Power Co., 208 Pa. 403; Ridgeway v. Electric Co., 258 Pa. 400; Donnelly v. Electric Co., 258 Pa. 580; Alexander v. Light Co., 209 Pa. 571; Winkelman v. Electric Light Co., 110 Mo. App. 184.

OPINION BY MR. JUSTICE MAXEY, May 26, 1933:

This is an appeal from the judgment of the Court of Common Pleas of Northumberland County, entered on the verdict in favor of plaintiff in the sum of $10,455, after denial of defendant's motions for judgment n. o. v. and for a new trial.

Plaintiff is a resident of the Borough of Mount Carmel and is a tinner and plumber by trade. Defendant is engaged in the business of supplying electric light, heat and power in that borough.

On March 30, 1928, which was a rainy day, plaintiff was employed by one J. Walter Penman, owner of a building on the east side of Pear Street, Mount Carmel. In the course of his employment and at or before 10:30 a. m. that day plaintiff went up on the flat roof of a building which adjoins the Penman Building on the

south and which is owned by one Thomas Tiddy, in order to repair a rainspout under the eaves.

Defendant at that time maintained a line of poles and wires along the east side of Pear Street. One of the poles stood near the junction of the Penman and Tiddy Buildings. On this pole there were two pairs of cross-arms extending east and west, the lower extending over the roof of the Tiddy house. Just below this lower arm and at the edge of the roof was a fuse box the top of which was from eighteen to twenty-four inches above the roof. On the upper cross-arms were strung high tension wires carrying 4,000 volts while low tension wires carrying 110 to 220 volts were strung on the street side of the lower cross-arms. On the street side of the pole there was a transformer. A neutral wire extended from the high tension wires down into the fuse box.

It was established through witnesses of both parties that under ordinary conditions this neutral wire carried no electric current, but that a break in or grounding of the wires would send a current of 2,100 volts into the wire and "blow the fuse." A witness for the plaintiff who had been an employee of defendant and had assisted in the installation of this fuse box six years prior to the date of the accident, testified that his superiors had issued orders that men working on such boxes wear rubber gloves while so doing; that in wet weather the outside of the box became a conductor of electricity. A witness for defendant testified that current could pass through the fuse box without blowing the fuse if that current was not of sufficiently high voltage to blow it. This witness was distribution engineer for the defendant and one of the superiors who 'had issued orders to employees of defendant to wear rubber gloves when working "on or around fuse boxes."

Plaintiff averred that at the time of the accident he was kneeling at the edge of the roof of the Tiddy Building and that, after having remained in that position for about five minutes, he "happened to raise" his head "and

came in contact with the fuse box on the cross-arm of the pole." He said, "It [i. e., the fuse box] extended over the roof." He declared that it was the back of his left ear that touched the fuse box. He then became unconscious and fell to the street below, a distance of about twenty-five feet. He was taken to the hospital where he later regained consciousness. He suffered burns at the base of the spine, on the hands, and behind his left ear, in addition to a fractured pelvis and internal injuries. A physician testified that when he arrived at the scene of the accident to render first aid to the plaintiff, he noticed a perceptible odor of burnt flesh.

Plaintiff and his employer testified that he did not go to the roof until 10 A. M. This was in rebuttal of two witnesses for defendant, Mrs. Caroline Muldowney and her young son. Mrs. Muldowney testified that she "saw a man" standing on the cross-bar of the pole near the wires at about 9:10 A. M. on the day of the accident. She said, "The day was raining and the wind was blowing," and the man "was sort of bent over toward the building." Her son gave similar testimony, but neither of them could identify plaintiff as the man they saw. It was the contention of the defense that the man these witnesses saw was plaintiff and that the burn at the base of the spine was received because he was on the pole and not on the roof at the time of contact and that the fuse box was not charged with electricity at the time plaintiff says it was.

Defendant admitted that it operated the electric line in question, and it was testified that the lines carried voltage of from 2,300 up to 4,000.

The physician who examined plaintiff six times testified that the scar behind plaintiff's ear indicated the point of entrance of the current and the scar at the base of the spine indicated the point of exit.

The breach of duty charged against defendant was that it negligently erected and maintained the fuse box in question, in close proximity to the roof of the Tiddy

Building (where the accident occurred) knowing that this electric device was dangerous and carried high voltage of electricity at any time there was a disturbance or interruption of the electric current or the lines managed and controlled by the defendant company.

The questions for determination herein are: (1) Was there sufficient evidence of defendant's negligence to submit to the jury? (2) Could the court declare plaintiff guilty of contributory negligence as a matter of law?

The duty of those legally charged with the use and control of high voltage electric current is well stated in an opinion by Mr. Justice MITCHELL in Fitzgerald v. Edison Electric Illuminating Co., 200 Pa. 540, 50 A. 161, as follows: "Wires charged with an electric current may be harmless, or they may be in the highest degree dangerous. The difference in this respect is not apparent to ordinary observation, and the public, therefore, while presumed to know that danger may be present, are not bound to know its degree in any particular case. The company, however, which uses such a dangerous agent is bound not only to know the extent of the danger, but to use the very highest degree of care practicable to avoid injury to every one who may be lawfully in proximity to its wires and liable to come accidentally or otherwise in contact with them." The principles thus stated have frequently been reiterated by this court. See Daltry v. Media Electric Light, Heat and Power Co., 208 Pa. 403, 57 A. 833; Ridgeway v. Sayre Electric Co., 258 Pa. 400, 102 A. 123; Alexander v. Nanticoke Light Co., 209 Pa. 571, 58 A. 1068.

The statement quoted is but an application to modern conditions of the common law doctrine that every man must have some knowledge "of the quality of his beast" (1 Hale P. C. 430) and impose a measure of control that is adequate to the protection of human beings from that "beast." This salutary rule must also apply to all agencies or instrumentalities in a man's possession and

subject to his intelligent control. Since a wet fuse box will conduct a current of electricity, it was defendant's duty to place it where human beings would not be likely to come in contact with it; if such isolation was impracticable, the fuse box should have been conspicuously labeled "dangerous." "A higher degree of care and vigilance is required in dealing with a dangerous agency than in the ordinary affairs of life or business, which involves little or no risk of injury to persons or property": 20 R. C. L., section 47, page 5. In Koelsch v. Phila. Co., 152 Pa. 355, 25 A. 522, which was an action of trespass to recover damages for personal injuries and for the destruction of a house caused by an explosion of natural gas, this court said: "While no absolute standard of duty in dealing with such agencies can be prescribed, it is safe to say in general terms that every reasonable precaution suggested by experience and the known dangers of the subject ought to be taken."

According to the testimony offered on behalf of the plaintiff, defendant placed the fuse box where any person who might happen to be on this flat roof could easily come in contact with it. It was shown at the trial that the roof was used for hanging clothes and was easily accessible from a kitchen door which opened on it. It was for the jury to say whether the defendant took every precaution suggested by experience and the known dangers of electricity to prevent injuries to persons who might lawfully be near this fuse box. The defendant company knew fuse boxes were dangerous, at times, to human touch. This knowledge was evidenced by the fact, above-stated, that it had forbidden its employees to work on fuse boxes without wearing rubber gloves.

As to plaintiff's contributory negligence, he was on the roof lawfully, called there to perform his duty. There is no proof that he reached out and touched the box in a desire to test its danger; the evidence is that he inadvertently came in contact with the box when he made a normal movement in shifting his working position.

Measured by the standard of conduct of a reasonably prudent man, it cannot be said as a matter of law that the plaintiff showed want of care under the circumstances. In appearance the box was innocuous; it exhibited no evidence of lurking danger.

Ridgeway v. Sayre Electric Co., supra, was a case where a man was killed by coming in contact with a defectively insulated wire belonging to an electric company, while he was engaged in inspecting a cable of the Bell Telephone Company, his employer. In that case, this court said in an opinion by the present Chief Justice: "We cannot say, as a matter of law, however, that deceased was negligent in failing to observe the defective insulation on a wire he had no special reason to examine closely. Nor is there evidence that either he or the telephone company had knowledge of the particular wire, or wires, of defendant carrying high voltage. While deceased was bound to know the danger of his position and to take proper care to guard against coming in contact with wires he knew carried a dangerous current......the questions whether he saw, or should have seen, the faulty insulation, in view of the circumstances and of the position in which he was obliged to work, and whether he took proper care for his safety, were for the jury."

In the case now before us, the facts are even stronger for negativing the charge of contributory negligence. There was no "defective insulation" of wires to be observed by anybody. Plaintiff had no reason to apprehend that a box which he saw before him would transmit into him a current of electricity if he came in contact with it. This court held in Yeager v. Edison Electric Co., 242 Pa. 101, 104, 88 A. 872, in an opinion by Mr. Justice POTTER: "One who is brought by his employment in close proximity to electric wires which are apparently insulated, can not be fairly charged with contributory negligence in coming in contact with the wires, unless the contact was the result of heedlessness, or of

his own lack of proper precautions for his safety." The question of plaintiff's contributory negligence was clearly a question for the jury.

It was also a question for the jury as to whether there was any interruption of current in defendant's line at or about the time of plaintiff's injury. It was testified in this case that the fuse box became charged with electricity only when there was an interruption of current by breaking defendant's line or otherwise. As to whether there was interruption the evidence is conflicting. The testimony of plaintiff's witnesses, while not direct and positive on that fact in issue, furnished, if credited, facts from which there could legitimately be inferred that there had been an interruption of current in defendant's line at or about the time plaintiff received the shock about which he complains. This testimony was all for the jury.

Complaint is made of the admission of testimony that there was no warning sign on the fuse box. Plaintiff in his statement set forth that the defendant company failed to provide any warning or signal that the "safety switch box and other appliances were dangerous and that electric current was passing in and through the same." Evidence of there being no such warning was admissible in support of this averment, and was also admissible as showing the circumstances immediately surrounding the act in question. These are always admissible as part of the res gestæ. See 11 Encyclopedia of Evidence, page 391.

Complaint is also made of the admission of testimony that the fuse box was not installed in accordance with the rules and regulations of the National Electrical Code as taken from the National Electric Light Association Safety Code. As the record stood, this testimony was of minimal importance and though it was not the way to prove usage (see Albus v. Toomey, 273 Pa. 303, 116 A. 917), its admission was not reversible error. Plaintiff in this case was under no obligation to prove that de-

fendant had departed from ordinary usage in the maintenance and location of its fuse box.

Appellant argues that "the unbending test of negligence in methods, machinery and appliances is the ordinary usage of the business," and that "no deviation by the defendant from any standard observed by those engaged in the same business was shown in this case. There is absolutely no competent testimony in this case that the equipment of the defendant or the construction of the equipment was not in accordance with the ordinary usage in the business." Usage becomes important only when the conduct in question is not inherently dangerous. Vigilance must always be commensurate with danger. A high degree of danger always calls for a high degree of care. The care to be exercised in a particular case must always be proportionate to the seriousness of the consequences which are reasonably to be anticipated as a result of the conduct in question. Reason does not have to wait on usage; the latter must wait on reason. Ordinary common sense dictates that if in a harmless looking box there is something lurking that would kill or injure anyone touching that box, the latter must be so situated, if it is possible or reasonably practicable to do so, that persons are not likely to come in contact with it. If the box must be placed where persons are likely to come in contact with it, there should be adequate warning given of its dangerous character. As this court said [referring to steam locomotives], in an opinion by Mr. Justice AGNEW in The Frankford & Bristol Turnpike Co. v. The Phila. & Trenton R. R. Co., 54 Pa. 345, 350: "It is the duty of those who use these hazardous agencies to control them carefully, to adopt every known safeguard, and to avail themselves from time to time to every approved invention to lessen their danger to others."

Usage may sometimes be treated as a factor in the measurement of due care, and "in a few cases the courts have considered that due care is established by showing that all precautions and safeguards customarily used in

the conduct of a similar business or occupation or in a similar undertaking have been adopted, although this view cannot be carried to the extent of justifying a custom which is so obviously dangerous to life and limb as to be at once recognized as such by all intelligent persons. ...... Customary methods or conduct do not furnish a test which is conclusive or controlling on the question of negligence, or fix a standard by which negligence is to be gaged. The standard of due care is such care as a prudent person would exercise under the circumstances of the particular case, and conformity to customary or usual conduct or methods cannot amount to more than a circumstance to be considered together with other circumstances of the case in determining whether due care has been exercised: 45 C. J., page 707, section 87.

"The common usage of the business is a test of negligence, but not a conclusive or controlling test": Cadillac Motor Car Co. v. Johnson, 221 Fed. 801.

In the case of Zartner v. George, 156 Wis. 131, 145 N. W. 971, the Supreme Court of Wisconsin aptly said: "If the act in question is obviously dangerous, then evidence of custom is inadmissible, because custom cannot change the quality of an act. ...... Hence, when its quality clearly appears from the act itself, there is no need to invoke the aid of custom to determine it."

A prudent, sensible person does not have to depend on usage to tell him that high voltage electric wires, or dynamite, or ferocious beasts, or poisonous reptiles are dangerous and that in handling them every precaution dictated by reason and common sense should be taken to prevent them from injuring persons who may be near them, and in deciding what these precautions shall be a person while he may take counsel of custom should also take counsel of his common sense and of his judgment. In the long run usage must conform to reason.

The judgment is affirmed.