488 A.2d 353

**COATESVILLE CONTRACTORS & ENGINEERS, INC., Appellants,**

**v.**

**BOROUGH OF RIDLEY PARK and H. Gilroy Damon Associates, Inc. and John P. Damon, Individually.**

Superior Court of Pennsylvania.

Argued Sept. 5, 1984.

Filed Dec. 5, 1984.

Petition for Allowance of Appeal Granted June 26, 1985.

148

Eugene F. Jarrell, III, Media, for appellants.

Thomas L. Kelly, Media, for appellees.

Before CIRILLO, OLSZEWSKI and MONTGOMERY, JJ.

OLSZEWSKI, Judge:

This is an appeal from a lower court's order dismissing both a motion to remove a compulsory non-suit and a motion for a new trial.[1]

---

1. Issues concerning appellants' motion for a new trial were never briefed for the court below and therefore, were not properly sub-

Appellants contend that the trial judge erred in granting appellee's motion for compulsory non-suit. Appellants claim that they produced sufficient evidence at trial to invalidate exculpatory language in the contract, thereby overcoming the appellee's motion for compulsory non-suit.

■ In reviewing the grant of a compulsory non-suit, the appellant must be given the benefit of every fact and reasonable inference arising from the evidence and all conflicts must be resolved in the appellant's favor. *McNally v. Liebowitz*, 498 Pa. 163, 170, 445 A.2d 716, 719 (1982). The testimony from below, read in the light most favorable to the appellant reveals the following.

In the Summer of 1977, the appellee, Borough of Ridley Park ("Ridley Park"), advertised for bids from contractors for the excavation of Ridley Park Lake. Bid documents were made available to potential bidders. These documents included Specifications for Removal of Silt and Debris from Ridley Park Lake. (R. 234a).[2] A clause contained in these specifications stated:

> The lake has been drained and shall remain in the drawdown condition until all silt debris removal work has been completed. The contractor shall remove silt and debris from areas as herein and shown on the plan.

Prior to bidding on the job, John Fallon, operating engineer for the appellants Coatesville Contractors and Engineers, Inc. ("Coatesville"), read all the bid documents and made an independent site inspection. (R. 51a, 52a). In the fall of 1977, Ridley Park awarded the job to Coatesville. The bid documents were incorporated into the final contract between the parties. *See* Appendix I. Testimony further revealed that at no time did Mr. Fallon or any other Coatesville official ever inquire as to what the phrase "drawdown"

mitted for review. Delaware County Local Rule of Civil Procedure 227.1.

2. A copy of the bid documents is attached as Appendix I.

condition meant or how Ridley Park intended to keep the lake in such a condition. (R. 108a, 109a, 117a). In November of 1977, Mr. Fallon made a second site inspection. He testified at trial that on both occasions he found the site to consist of a lake bed with a small stream running through it. (R. 52a–58a).

In March of 1978, Ridley Park noticed Coatesville to commence work. Mr. Fallon and Mr. Reid, a Coatesville on-site supervisor, both testified that when Coatesville arrived at the site, the lake was full of water. (R. 63a, 177a, 178a). The situation was brought to the attention of Mr. Damon, engineer for the Borough. (R. 63a). Yet despite the condition of the lake, Coatesville commenced work on the project and in fact completed 85% of the job by May of 1978. In August of 1978 Coatesville left the work site over a dispute whether the job had been completed to specifications. After negotiations, Coatesville returned to the site in 1979, completed certain work and received final payment on the contract.

Coatesville later brought an action against Ridley Park seeking to recover additional compensation over and above the contract price which it alleged was caused by Ridley Park's failure to keep the lake in a "drawdown" condition. At trial, Mr. Fallon testified that he read and understood the bid documents including the following exculpatory provisions:

*Article II, Paragraph 3.*

The contractor shall not be entitled to demand or receive payments for any work as extra work, unless ordered in writing by the committee to do the same as such, and at a price fixed by them previous to its commencement.

*Article III, Paragraph 2.*

The contractor agrees that he has satisfied himself by his own investigation and research regarding all of the conditions affecting the work to be done and labor and material needed, and that his conclusion to execute this contract is based on such investigation and research, and not on the estimate of the quantities or other information pre-

pared by the engineer and that he will make no claim against the municipality because of any of the estimate tests or representations of any kind affecting the work made by any agent of the municipality may prove to be in any respect erroneous.

*Article IV, Paragraph 2.*

The contractor shall not be entitled to any claims for damages from any hinderance or delay from any cause whatever in the progress of the work, or any portion thereof, but when such hinderance or delay results from causes entirely beyond the control of the contractor, said hinderance or delay, excepting such as may from time to time result from ordinary and not unusual weather conditions for the season of the year when he is at work may entitle the contractor to such an extension of time for completing the contract as may be determined by the committee, provided the contractor shall have given notice in writing of the cause of detention.

*Article V, Paragraph 4*

All loss or damages arising out of the nature of the work to be done under the contract, or from any unforeseen obstructions or difficulties which may be encountered in the prosecution of the same, or from the action of the elements, or from encumbrances on the line of work, shall be sustained by the contractor.

R. 122a, 123a, 126a.

Following Coatesville's presentation of its case, the trial court granted Ridley Park's motion for compulsory non-suit. This appeal followed the lower court's refusal to remove the compulsory non-suit.

 Appellants contend that the compulsory non-suit should not have been granted because sufficient evidence had been presented at trial to overcome the exculpatory contractual language which the lower court claimed barred Coatesville's recovery. The law regarding compulsory non-suits is clear. A compulsory non-suit is warranted only in clear cases where the facts and circumstances have as the only conclusion the absence of liability. *McNally v. Lie-*

*bowitz, supra.* Similarly, a non-suit is proper when facts constituting an affirmative defense are so established by uncontradicted testimony in the plaintiff's case that any reasonable possibility of an inference to the contrary is excluded. *Plummer v. Wesner,* 217 Pa.Super. 24, 268 A.2d 144, 145 (1970). Therefore, in the instant case, Coatesville must have shown by a preponderance of the evidence that it was not bound by the contract's exculpatory language. Because if, as a matter of law, there was insufficient evidence to prove this, then Coatesville was bound by the contractual language and the non-suit was properly granted.

Pennsylvania courts have frequently held that exculpatory provisions will not work as a defense where there has been an affirmative or positive interference by a party or a failure to act in some essential matter necessary to the prosecution of the work. *Gasparini Excavating Co. v. Pa. Turnpike Commission,* 409 Pa. 465, 187 A.2d 157 (1963), *Commonwealth Department of Highways v. S.J. Grover and Sons Co.,* 20 Pa.Cmwlth. 526, 343 A.2d 72 (1975). Appellants contend that Ridley Park affirmatively interfered with the prosecution of its work by ordering them to commence work while the lake was not in a "drawdown" condition and by not discovering what was causing the lake to retain the water. Appellants, further contend that Ridley Park failed to act in some essential matter necessary for the prosecution of the work by not putting the lake in a "drawdown" condition as required in the bid specifications. This Court concludes that the testimony from the proceedings below supports neither of appellants' contentions.

 We agree with the lower court's conclusion that Coatesville offered insufficient evidence to support its claim that Ridley Park affirmatively interfered with its efforts to complete the excavation work. Neither Mr. Fallon nor Mr. Reid testified that anyone associated with Ridley Park took any steps to interfere with Coatesville's work. In fact Mr. Fallon testified that he "never came up and said that the Borough of Ridley Park is not holding up their end of the

contract by getting the water out of the lake...." (R. 74a). Moreover, although evidence was presented that borough personnel worked on the lake's drainage valve, this activity was never characterized by Coatesville as any type of interference with their work. Coatesville cites the *Gasparini* case in support of its claim that Ridley Park interfered with its work efforts. This case is inapposite. In *Gasparini*, the plaintiff was physically denied access to the work area. In the case at bar, there was no such denial as is evidenced by testimony that (1) Coatesville immediately began work even though the work site was covered by water; and (2) after two months the project was 85% completed.

■ We turn now to Coatesville's claim that Ridley Park failed to perform an essential matter under the contract by not keeping the lake in the "drawdown" condition. Here again we agree with the lower court's determination that Coatesville did not present sufficient evidence on this point. At trial Mr. Fallon testified that he read and understood both the "drawdown" provision and the exculpatory provisions contained in the bid documents. (R. 122a, 123a, 126a). In addition, no evidence was presented that Coatesville ever challenged any of these contractual provisions either at the time of bidding or when Coatesville arrived at the work site in March of 1978. Finally, Coatesville never utilized the contract's protective provision. This provision, namely Article IV, paragraph 2 (supra) allowed a contractor to submit written notice of any work delay or hindrance to a committee for resolution. Evidence from the proceeding below reveals that this was never done. Instead Coatesville elected to proceed with the job at its own risk.

■ Since Coatesville failed at trial to prove either an affirmative interference or a failure to act on an essential matter, the contract's exculpatory language was not invalidated. We therefore conclude that the lower court properly denied appellants' motion for removal of the compulsory

non-suit. Accordingly, the order of the lower court is affirmed.

Order affirmed.

APPENDIX I

FORM OF PROPOSAL
for
REMOVAL OF SILT AND DEBRIS
from
RIDLEY PARK LAKE
BOROUGH OF RIDLEY PARK
Del. Co., Pa.

-------------------------------

H. Gilroy Damon Associates, Inc.
Civil Engineers
Sharon Hill, Pa.

September 1977

<u>INFORMATION TO BIDDERS</u>

Sealed bids will be received by the Members of Council for the Borough of Ridley Park, Delaware County, Pa., until 7:30 p.m. (Eastern Daylight Saving Time), Tuesday, September 27, 1977, when Council will convene in regular session in the Council Chamber of the Borough Hall, Ward and Cresswell Streets, Ridley Park, Pa., and all bids received will be publicly opened and read aloud for the following:-

> Removal of Silt and Debris (all unclassified) from Ridley Park Lake and Settling Basin.

A certified check or bid bond in the amount of ten percent (10%) of the total bid price, payable to the Borough of Ridley Park, must accompany each Proposal.

Each bid must be enclosed in a sealed envelope and addressed to Ridley Park Borough Council, in care of Mrs. Joanne B. Miles, Secretary, Borough Hall, Ridley Park, Pa. 19078, and write in the lower left hand corner on face of sealed envelope "Proposal for Removal of Silt and Debris from Ridley Park Lake and Settling Basin."

Plans, specifications and bidding forms are on file and may be obtained at the office of H. Gilroy Damon Associates, Inc., Civil Engineers, Chester Pike and High Street, Sharon Hill, Pa.

The successful bidder will be required to furnish bonds for material and labor, and satisfactory completion, as well as insurance certificates, and enter into a Contract acceptable to the Borough Solicitor.

Borough Council for the Borough of Ridley Park reserves the right to hold all bids for a period of 90 days before awarding the Contract.

Borough Council for the Borough of Ridley Park reserves the right to accept any bid, or parts thereof, and to reject either the whole or part of any bid, or to reject all bids, and to waive any informalities in the bidding as they deem for the best interest of the Borough.

BY ORDER OF BOROUGH COUNCIL

(Mrs.) JOANNE B. MILES, Secretary
Ridley Park Borough Council

FORM OF PROPOSAL
for
REMOVING SILT AND DEBRIS
from
RIDLEY PARK LAKE
BOROUGH OF RIDLEY PARK
Del. Co., Pa.
----------------------------

To The President and Members of Council
Borough of Ridley Park
Borough Hall
Ward and Cresswell Streets
Ridley Park, Pa. 19078

Gentlemen:

The undersigned (hereinafter called The Bidder) hereby proposes to furnish all labor, tools and equipment as required to remove silt and debris (approximately 17,000 cu. yds. all unclassified) from Ridley Park Lake, Settling Basin, and the portion of Little Crum Creek which connects the Settling Basin with the Lake, and dispose of said silt and debris all in strict accordance with the plans, specifications, Borough Ordinances and requirements of The Departments of The Commonwealth of Pennsylvania relating thereto, for the lump sum price of:-

Price in Figures Price in Writing

( _76,129_ ) ( _Thirty six thousand one ___ )Complete

The Bidder agrees within five (5) days after notice in writing of the acceptance by The Borough of Ridley Park of this Proposal, either in whole or in part, to enter into a Contract in writing for so much of said work as may be awarded to him, in such form as may be approved by the Solicitor of the said Borough, and to execute a bond equal to one hundred percent (100%) of the Contract price with such surety or sureties as shall be approved by the Members of Council for said Borough, conditioned for the faithful performance of said Contract, for the completion of the work there-

in mentioned with the said plan and specifications and to the satisfaction of Borough Council within sixty (60) weather working days from the date of execution of Contract Agreement, for the payment of all monies due for labor and materials furnished in the construction of said work and for indemnifying The Borough against all loss, damage, costs, charges (including counsel fees) sustained or incurred by the said Borough for or by reason of any act, neglect or default on the part of the said Bidder.

WITNESS the hand and seal of the said Bidder this _____

_____ day of _____ A.D. 1977.

_____ (L.S.)

Post Office Address

_____

_____

## ENVIRONMENTAL PROTECTION

It will be the Contractor's responsibility to conform to the requirements of The Department of Environmental Resources as follows:

1. Reduce by the greatest extent practicable, the area and duration of exposure of readily erodible soils.

2. Protect the soils by use of temporary vegetation or seeding and mulch, or by accelerating the establishment of permanent vegetation. Complete and protect segments of work as rapidly as is consistent with construction schedules.

3. Retard the rate of runoff from the construction site and control disposal of runoff.

4. Trap sediment resulting from construction in temporary or permanent silt holding basins. This includes pump discharges resulting from dewatering operations.

5. Sprinkle or apply dust suppressors or otherwise keep dust within tolerable limits on haul roads and at the site.

6. Use temporary bridges or culverts where fording of streams is objectionable. Borrow areas should be at a location where pollution from the operation can be minimized. Locations should be avoided where pollution would be inevitable.

7. Should construction operations be suspended for any appreciable length of time, temporary measures for the control of erosion must be utilized.

8. Provision be made for protection against discharges of pollutants such as chemicals, fuel, lubricants, sewage, etc., into the stream.

9. All operations shall be conducted in such a manner to minimize turbidity in the stream at and below the site of the structure. Permittee shall meet the requirements on turbidity as established by The Department of Environmental Resources.

10. The Contractor shall, at all times, keep the premises free from accumulation of waste material or rubbish caused by his employees or work.

Before the work will be considered as having been completed, the Contractor shall clean and remove from the project and adjacent property, all surplus and discarded material, equipment and temporary structures and shall leave the project "Broom Clean."

1/30/74

## GENERAL CONDITIONS

### for

### MUNICIPAL IMPROVEMENTS

## I. Definitions

1. "Contract" shall mean the entire agreement between the parties, including the General Provisions, the specifications, Contractor's accepted proposal, the Advertisement of the Information for Bidders, copies of which are bound herewith, and the Contract Drawings, all of which are hereby made a part hereof as though herein set forth in full.

2. "Work" shall mean all plant, labor, materials and other facilities, and all other things necessary or proper for or incidental to the construction of the work as covered by the Contract Drawings and various items of the Contract.

3. "Extra Work" shall mean work required by the municipality in addition to that required by the Contract Drawings in their present form.

4. "Plans or Drawings" shall mean the Contract Drawings listed in the Proposal of the Specifications.

5. "Municipality" shall mean the City, Borough or Township, as the case may be.

6. "Committee" shall mean the Sewer or Highway Committee of the Municipality.

7. "Engineer" shall mean H. Gilroy Damon Associates, Inc., Chester Pike and High Street, Sharon Hill, Pennsylvania.

8. "Inspector" shall mean any representative of the Municipality or Engineer especially designated by it, or them, to act as Inspector, acting within the particular authority vested in him. The decision of any inspector, however, is reviewable by the Engineer.

9. "Contractor" shall mean the Bidder who has signed the original contract, or his sureties.

10. "A.S.T.M." shall mean American Society for Testing Materials.

## II. Payments

1. Payments on work shall be made to the Contractor in monthly installments of eighty (80) per cent of the amount of the work executed during the preceding month under and in accordance with the provisions and stipulations of the contract, which will be certified by the Engineer. The current monthly estimates and payments shall not bind the municipality to the acceptance of any materials furnished or work done.

2. Final and full payment of the balance due to the Contractor for work, after all legal and equitable deductions, will be made upon acceptance and approval of the municipality, one month after the date of completion, provided the whole work, and each of its parts be in perfect order.

3. The Contractor shall not be entitled to demand or receive payments for any work as extra work, unless ordered in writing by the committee to do the same as such, and at a price fixed by them previously to its commencement.

4. The Contractor must preserve all stakes, bench marks, etc., made or established on the line of the work, until authorized to remove the same. All lines, grades and certificates to be furnished the Contractor by the Engineer.

## III. Plans and Specifications

1. These specifications and the accompanying plans are intended to require and include all work and material necessary and proper for the work contemplated. In case, by inadvertence or otherwise, the plans or specifications omit to require some work or material necessary for that purpose, the Contractor shall, nevertheless, be required to provide the same so that the work may be complete according to the true intent and purpose of the plans and specifications.

2.) The Contractor agrees that he has satisfied himself by his own investigation and research regarding all the conditions affecting the work to be done and labor and material needed, and that his conclusion to execute this contract is based on such investigation and research, and not on the estimate of the quantities or other information prepared by the Engineer, and that he will make no claim against the municipality because any of the estimates, tests or representations of any kind affecting the work made by any agent of the municipality may prove to be in any respect erroneous.

3. Copies of the plans and specifications shall at all times be kept on file by the Contractor at readily accessible points along the line of the work.

4. No deviation from the approved plans or specifications will be allowed unless by a written direction from the Committee.

## IV. Progress and Conduct of Work

1. The Contractor shall begin work within five (5) days from the date of the notice to that effect by the Committee, and he shall complete all works under this contract within the time specified in the proposal, which shall be reckoned from the date of the said notice.

2. The Contractor shall not be entitled to any claims for damages from any hindrance or delay from any cause whatever in the progress of the work, or any portion thereof, but when such hindrance or delay results from causes entirely beyond the control of the Contractor, said hindrance or delay, excepting such as may from time to time result from ordinary and not unusual weather conditions for the season of the year when he is at work, may entitle the Contractor to such an extension of time for completing the contract as may be determined by the Committee, provided the Contractor shall have given notice in writing of the cause of the detention.

3. The sum of twenty-five dollars ($25.00) per day for each day that any work shall remain uncompleted after the time specified in the contract for its completion shall be deducted from the amounts due said Contractor, not as a penalty but as just and liquidated damages.

A working weather day shall be a day in which no rain nor snow shall fall, that the temperature shall be above thirty-two (32) degrees F. for at least fifty per cent (50%) of the time provided, however, if the Contractor shall actually work for six (6) hours, it shall be considered a working weather day.

4. Should the Contractor neglect or abandon the work, or if at any time the Engineer be convinced that the work is unreasonably delayed, or that the conditions of the contract are being wilfully violated, or executed carelessly or in bad faith, he may notify the Contractor in writing, and if his notification be without effect within twenty-four (24) hours after the delivery thereof, then and in that case the Contractor shall discontinue all work under the contract and the Committee shall have full authority and power immediately to purchase and hire materials, tools, labor and machinery for the completion of the contract at the expense of the Contractor or his sureties or both; or the said contract may be declared null and void, and the security bond and the retained percentage and the materials built into the work and the materials delivered shall then become the property of the municipality.

5. Generally, all materials excavated or removed from within the required limits of the excavation shall be considered the property of the municipality and all materials not required for refilling placed in such place or places in the municipality as may be designated by the Committee. The materials removed shall be used for the better construction, support, and protection of the work when

. The municipaltiy reserves the right to increase or diminish the gross length of the work. No allowances will be made in case of increase for any sum above prices bid, nor in case of decrease for any real or supposed damage or loss of profit occasioned by such diminution. The time stipulated for the completion of the work may be proportionately increased or diminished.

. If any dispute or difference shall arise as to the efficiency of labor, or quality of materials employed, or as to the proper execution of the work, they shall be settled by the Committee whose decision shall be final and conclusive.

8. The Contractor shall give his personal attention constantly to the faithful prosecution of the work, shall keep the same under his personal control, and shall not assign by power of attorney or otherwise, or sublet the work or any part thereof without the previous written consent of the municipality. He shall state to the Engineer in writing the name of any subcontractor he intends to employ, the portion of the work which he is to do or the material which he is to furnish, his place of business and such other information as the municipality may require in order to know whether such subcontractor is reputable and reliable, and able to perform the work or to furnish the material as called for in these specifications. He shall not, either legally or equitably, assign any of the moneys payable under this agreement or his claim thereto unless by and with the like consent of the municipality.

9. Any materials condemned or rejected by the Engineer as not conforming to these specifications shall be removed from the work.

10. Any defective work or material that may be discovered by the Engineer before the final acceptance of the work or before final payment has been made shall be removed and replaced by work and material which shall conform to the spirit of the specifications. Failure or neglect on the part of the Engineer to condemn or reject inferior work or materials shall not be construed to imply acceptance of such work or materials.

11. Should it be deemed advisable by the Committee, the Contractor shall furnish all tools, labor and materials necessary to make an examination of any work completed or in progress under these specifications. Should such work be found defective, the cost of making such examination and of satisfactory reconstruction shall be borne by the Contractor. Should the work be found to be satisfactory, the cost of the examination will be paid by the municipality.

12. , The Contractor shall give his personal supervision to the faithful prosecution of the work and in case of his absence, he shall have a competent representative or foreman on the work who shall follow without delay all instructions of the Engineer or his assistants in the prosecution and completion of the work and every part thereof, and who shall have full authority to supply men, material and labor immediately.

13. The Contractor shall employ only competent, skilful men to do the work, and whenever the Engineer shall notify the Contractor in writing that, in his opinion, any man on the work is incompetent, impertinent, disobedient, unfaithful, disorderly or otherwise unsatisfactory, such man shall be discharged from the work and shall not again be employed on it except with the consent of the Engineer.

14. The work is to be prosecuted in such manner, and from as many different points, at such times, in such parts, and with such force as the Committee from time to time during the progress of the work may determine.

No tunnelling will be allowed except by written consent and in accordance with the directions of the Engineer.

15. The Contractor shall execute his work in the presence of an inspector furnished by the Engineer, during the working hours of the day, unless specially directed otherwise.

## V. Legal Relations and Contractor's Miscellaneous Responsibilities.

1. The Contractor shall have and maintain at all times during the progress of the work a sufficient amount of Workmen's Compensation Insurance to meet any possible claims of his employees and shall furnish the municipality, previous to starting construction, a certificate from the insurance company showing that he carries such insurance, it being understood and agreed that the Contractor shall also be solely responsible for all such claims. The Contractor shall also furnish the municipality, previous to starting construction, a certificate from the insurance company showing that he is fully protected by public liability insurance.

2. In the prosecution of all parts of this work from its commencement until its completion and final acceptance by the municipality and including any portions done under force account, or as extra work, the Contractor shall take such precautions as may be necessary to guard all public and private property and all persons from injury, and he shall indemnify and save harmless the municipality and all of its officers, agents and employees against all suits, claims and actions of every name and description, brought against them, and all costs and damages to which the municipality may be put on account, or by reason of any injury or alleged injury to the person or property of another, resulting from negligence or carelessness in the performance of the work, or in guarding the work, or from any improper materials used, or by or on account of any act or omission of the Contractor, or his agents, or employees. The whole or so much of the moneys due to the Contractor under this contract as shall be or may be considered necessary by the municipality shall and may be retained by the municipality until all of the aforesaid suits and claims for damages shall have been settled and evidence to that effect furnished to the satisfaction of the municipality.

3. During the performance of this work the Contractor shall place proper barriers and guards upon and around the work for the prevention of accidents, and at night shall put up and maintain suitable and sufficient lights. The cost of said guarding and protection is to be included in the price bid upon the other items of the work.

4. All loss or damages arising out of the nature of the work to be done under the contract, or from any unforeseen obstructions or difficulties which may be encountered in the prosecution of the same, or from the action of the elements, or from incumbrances on the line of the work, shall be sustained by the Contractor.

5. In all the operations connected with the work herein specified all state laws and local by-laws or ordinances controlling or limiting in any way the actions of those engaged in the work, or affecting the method of doing the work or materials applied to it, must be respected and strictly complied with.

162

The Contractor shall procure all permits and licenses, pay all charges and fees, and give all notices necessary and incident to the proper and lawful prosecution of the work.

6. All fees or royalties for any patented invention, article or arrangement in any manner connected with the work, or with these specifications, shall be included in the price stated in the proposal, and the contractor shall protect and hold the municipality harmless against any and all demands or claims for such fees or royalties, whether such demands or claims are filed during the life of this contract or after its completion.

7. The Contractor shall make suitable and adequate provision for the safe and free passage of persons and vehicles by, over or under the work while it is in progress.

8. Should public travel be wholly obstructed at any point, the Contractor shall place plain and properly worded signs at the nearest cross streets or wherever the public can pass around the obstruction by the shortest and easiest route.

9. The municipality reserves the right to let other contracts in connection with this work. The Contractor shall afford other contractors reasonable opportunity for the introduction and storage of their materials and the execution of their work: He shall properly connect and coordinate his work with theirs, and shall so conduct his work as not to interfere with any other work which the municipality may carry on by their own forces or by contract on the site.

10. The Contractor hereby further agrees that all the work built by him under this contract shall be kept in good and satisfactory condition for the period of one year after the completion of the work to be done under this contract.

11. Should any defects in the work or structures become evident before the expiration of the above guarantee, the Contractor shall within five (5) days from the date of the receiving of personal notice or the mailing of a notice by the Engineer to the Contractor proceed to remedy such defects of whatever nature or extent or whenever and wherever found in a proper manner and to the satisfaction of the Engineer and at the expense of the Contractor to begin such repairs within the five (5) days above noted, the municipality shall have the right to make such repairs and the cost thereof shall be paid by the Contractor, and it is expressly agreed by and between the Contractor and the municipality that the surety bond attached to and made a part of this contract shall be in full force until the expiration of one (1) year from the date of the payment of the final amount due the Contractor for work done and materials furnished under this contract.

### VI. Restorations

1. After the completion of the work the sewers, manholes, inlets, streets, curbs and sidewalks, bridges and all places affected by the work, both public and private, are to be thoroughly cleared and left clean, free and in good order and fit for travel.

2. All classes of curb, sidewalk, drives, street pavement, lawn areas and all works of drainage or other structures met with in prosecution of the work shall be restored and made good, or taken down and rebuilt to the extent made necessary by the new work, the same must be restored by the Contractor in strict accordance with the specification or with the municipality regulations, at the Contractor's expense.

3. The Contractor shall meet all requirements of railroad companies and state highway departments wherever the work crosses or is adjacent to their rights-of-way.

4. Should the work lead through private properties, the municipality will pay the compensation for rights-of-way but no other damage.

SPECIFICATIONS
for
REMOVAL OF SILT AND DEBRIS
from
RIDLEY PARK LAKE .
-------------------------------

SCOPE OF WORK

1. The Lake has been drained and shall remain in the drawdown condition until all silt and debris removal work has been completed. The Contractor shall remove silt and debris from areas as herein described and shown on the plan.

 A. The area to be excavated shall extend from the Dam at Ridley Avenue to the spillway on the upstream end of the Settling Basin. Only the main body of the Lake, Settling Basin and main stream connecting the Settling Basin with the Lake shall be excavated.

 The branch stream shall not be excavated.

 B. The main body of the Lake shall be excavated to a depth of four feet (4') below the spillway level of the Dam at Ridley Avenue, with a slope of approximately five feet to one foot (5':1') at the shore line, except where existing stone masonry walls will permit shore line excavation to a depth of four feet (4').

 C. The main stream shall be excavated to a depth of two feet (2') below the water level.

 D. The Settling Basin shall be excavated to a depth of four feet (4') below the spillway level at the discharge end of the Settling Basin.

 E. In addition to the work described in paragraphs "A" thru "D", the Contractor shall also remove all loose debris (all unclassified) in and on the stream bed and banks of Little Crum Creek from the spillway at the upstream end of the Settling Basin to the Baltimore & Ohio Railroad Bridge, approximately 1000' upstream of the Settling Basin.

 Disposal of material removed under this paragraph shall be as specified under Item No. 2.

2. The excavated silt and debris shall be the property of the Borough and shall be disposed of by the Contractor on Borough owned property adjacent to the Lake and south of Ridley Avenue, as directed by The Borough. The Contractor shall not be required to clear and grub the disposal sites; however, the Contractor shall be completely responsible for providing and maintaining dikes, as required, to prevent any of the disposed material from being deposited in the Creek adjacent to the disposal sites.

3. All areas disturbed by the excavating operations shall be restored to their original condition by the Contractor.

4. The Engineer has provided plans, specifications and estimated quantities, but The Borough will assume no responsibility for same and the Contractor is required to check all such estimates of quantities.

5. The lump sum price bid in the Proposal shall be complete and full payment for removal of all silt and debris to the limits as specified herein and shown on the plan and all restoration work.

6. The Borough will allow free right-of-way over its property and streets but any spillage of material on property or streets shall be promptly cleaned up so that it may not cause a nuisance or hazard.

7. Ridley Avenue and the bridge are under the jurisdiction of Penna. Department of Transportation and any permits required by them shall be obtained by the Contractor.

*Coatesville Contractors & Engineers*

INCORPORATED

1100 BONDSVILLE ROAD

DOWNINGTON PA. 19335

(215) 384-2731

August 9, 1978

H. Gilroy Damon Associates, Inc.

Chestor Pike and High Street

Sharon Hill, PA 19079

Attention: John P. Damon

RE: Ridley Park Lake

Gentlemen:

We are hereby requesting an additional $17,000.00 for the additional cost incurred to dredge the Ridley Lake while it was not in the draw down position.

We also would like to set up a meeting at the job site at your earliest convenience to discuss the punch list dated August 8, 1978.

If you have any questions, please do not hesitate to call.

Very truly yours,

COATESVILLE CONTRACTORS & ENGINEERS, INC.

/s/ John J. Fallon, Jr.

John J. Fallon, Jr.

JJF/KMB

Enclosure

## Coatesville Contractors & Engineers

INCORPORATED

1100 BONDSVILLE ROAD DOWNINGTOWN PA 19335 (215) 384.2731

Borough of Ridley Park
Ridley Park, PA 19078

INVOICE

DATE OF INVOICE 8/9/78

WORK ORDER

PURCHASE ORDER

WEEK ENDING

DESCRIPTION: Removal of silt and debris from Ridley Park Lake

| Labor & Equipment | Hours | Rate | Total | Grand Total |
|---|---|---|---|---|
| Additional cost | | | $17,000.00 | |